McKAIN v MOORE

Docket No. 96098. Submitted December 8, 1987, at Grand Rapids. Decided October 17, 1988.

Clarence H. McKain, III, and Karen McKain brought a medical malpractice action in the Kalamazoo Circuit Court against Charles Moore, M.D., Kalamazoo Emergency Associates, P.C., Borgess Medical Center, John W. Copenhaver, M.D., and Kalamazoo Radiology, P.C. The trial court, C. H. Mullen, J., ruled that an arbitration agreement signed by Clarence McKain was valid and binding, granted Borgess' motion to compel arbitration, and denied plaintiffs' motion for summary disposition. Judge Mullen then denied plaintiffs' motion to disqualify himself. Kalamazoo Circuit Chief Judge Richard Ryan Lamb, on de novo review of the denial of the motion to disqualify, also denied plaintiffs' motion to disqualify Judge Mullen. A stipulation and order was subsequently entered applying the order compelling arbitration to defendants Copenhaver and Kalamazoo Radiology. Plaintiffs appealed.

The Court of Appeals held:

1. Defendants carried their initial burden of establishing that the arbitration agreement was executed in strict compliance with the Medical Malpractice Arbitration Act (MMAA). A presumption of validity therefore arose. The evidence, however, indicates that the plaintiffs were never provided with an arbitration information booklet as mandated by the MMAA. Plaintiffs therefore rebutted the presumption of validity established by defendants. The trial court's finding that the MMAA had been complied with was in error. The order compelling arbitration is reversed.

2. Clarence McKain did not receive emergency medical care treatment within the meaning of the MMAA and the act's emergency exception does not apply here.

3. The trial court properly held that the parties had reached

REFERENCES

Am Jur 2d, Arbitration and Award §§ 1 et seq., 11 et seq.
Am Jur 2d, Judges §§ 86 et seq.
Am Jur 2d, Physicians, Surgeons, and Other Healers § 376.
Arbitration of medical malpractice claims. 84 ALR3d 375.

a meeting of the minds and a valid and enforceable contract was formed.

4. The trial court erred in ruling that the arbitration agreement was binding with regard to the defendants' actions taken subsequent to Clarence McKain's original discharge from the hospital. The arbitration agreement was not binding with regard to such subsequent actions.

5. Neither Judge Mullen nor Judge Lamb erred in denying plaintiffs' motion to disqualify Judge Mullen.

Affirmed in part, reversed in part and remanded.

1. ARBITRATION — MEDICAL MALPRACTICE ARBITRATION ACT.

An arbitration agreement under the Medical Malpractice Arbitration Act is not legally valid unless it is in strict compliance with the act (MCL 600.5040 *et seq.*; MSA 27A.5040 *et seq.*).

2. ARBITRATION — MEDICAL MALPRACTICE ARBITRATION ACT — BURDEN OF PROOF — PRESUMPTION OF VALIDITY.

The burden of establishing the existence of an arbitration agreement that conforms to the strict requirements of the Medical Malpractice Arbitration Act rests with the party seeking to enforce the agreement; once prima facie evidence of such an agreement has been presented, the statutory presumption of validity accrues, and the burden of going forward with evidence to rebut the presumption then shifts to the party seeking to avoid the agreement (MCL 600.5040 *et seq.*; MSA 27A.5040 *et seq.*).

3. ARBITRATION — MEDICAL MALPRACTICE ARBITRATION ACT — PRESUMPTION OF VALIDITY.

A medical malpractice arbitration agreement is enforceable and presumed valid where the agreement complies with the provisions of the Medical Malpractice Arbitration Act, is in writing, has been signed by the person who received health care or treatment or a legal representative, is revocable in writing for sixty days, states above the signature line in twelve-point boldface type that the agreement to arbitrate is not a prerequisite to health care treatment and may be revoked within sixty days, the patient is given a copy of the arbitration agreement and a booklet detailing the specific provisions of the agreement, and the offer to arbitrate does not precede the provision of emergency medical care (MCL 600.5041, 600.5042; MSA 27A.5041, 27A.5042).

4. ARBITRATION — MEDICAL MALPRACTICE ARBITRATION ACT — HABIT AND ROUTINE.

Evidence of habit or routine of a hospital or health care provider

is relevant in an action challenging the validity of a malpractice arbitration agreement to establish that the conduct of the person or organization on a particular occasion was in conformity with the habit or routine practice of the person or organization (MCL 600.5040 *et seq.*; MSA 27A.5040 *et seq.*).

5. Arbitration — Medical Malpractice Arbitration Act — Emergency Health Care or Treatment.

The term "emergency health care or treatment" used in the Medical Malpractice Arbitration Act means any care or treatment urgently warranted by circumstances under which a delay for the patient to read and consider an offered arbitration agreement would endanger the life or health of the patient (MCL 600.5042[1]; MSA 27A.5042[1]).

6. Arbitration — Contracts.

Contract principles apply to arbitration agreements and a true meeting of the minds, judged by an objective standard, looking to the express words of the parties and their visible acts, is required for a valid arbitration agreement.

7. Judges — Disqualification of Judges.

The prejudice or bias of a trial judge must be shown by a party seeking the disqualification of the judge on such grounds.

*Zarbock & Ford* (by *James B. Ford*), for plaintiffs.

*Bremer, Wade, Nelson & Alt* (by *Robert N. Alt, Jr.*), for Charles Moore, M.D., and Kalamazoo Emergency Associates, P.C.

*Dykema, Gossett, Spencer, Goodnow & Trigg* (by *Stephen S. Muhich* and *Todd W. Kingma*), for Borgess Medical Center.

*Bennett, LaParl & Milligan, P.C.* (by *John R. LaParl*), for John Copenhaver, M.D., and Kalamazoo Radiology, P.C.

Before: Maher, P.J., and Gribbs and L. F. Simmons, Jr.,* JJ.

L. F. Simmons, Jr., J. Plaintiffs appeal as of right from Kalamazoo Circuit Judge C. H. Mullen's opinion and order of October 14, 1986, granting defendant Borgess Medical Center's motion to compel arbitration and denying plaintiffs' motion for summary disposition. Plaintiffs also appeal from Kalamazoo Circuit Chief Judge Richard Ryan Lamb's order denying plaintiffs' motion to disqualify Judge Mullen.

On March 29, 1985, plaintiff Clarence McKain, accompanied by his fiancee Karen, presented himself at defendant Borgess Medical Center's emergency room, complaining of right shoulder pain. Eventually, he was examined by defendant Dr. Charles Moore and the shoulder was x-rayed. Dr. Moore diagnosed a pulled muscle, immobilized Clarence's right shoulder with a sling, and recommended that he not return to work for a couple of days. Sometime between the time he arrived at Borgess and his discharge, Clarence signed an arbitration agreement.

The following day, defendant Dr. John Copenhaver, employed by defendant Kalamazoo Radiology, P.C., reviewed the shoulder x-rays. He diagnosed a defect or possible malignancy in the lateral portion of Clarence's right scapula and recommended that follow-up testing be done. No further action was taken and Clarence was not notified of Dr. Copenhaver's diagnosis or recommendation.

Over two months later, Clarence returned to Borgess with continued shoulder complaints and was diagnosed as suffering from osteosarcoma, a generally malignant bone tumor.

On May 9, 1986, Clarence and Karen McKain,

* Circuit judge, sitting on the Court of Appeals by assignment.

then married, filed suit in Kalamazoo Circuit Court alleging medical malpractice against the named defendants. Clarence died on May 20, 1986, as a result of the osteosarcoma.

Borgess moved to compel arbitration. Plaintiffs responded with a motion for summary disposition. Judge Mullen ruled that the arbitration agreement signed on March 29, 1985, was valid and binding. Accordingly, he granted Borgess' motion to compel arbitration and denied plaintiffs' motion for summary disposition.

Plaintiffs later learned that Judge Mullen sat on the Board of Directors of Bronson Methodist Hospital, another Kalamazoo hospital, as he had done for twenty-five years. Plaintiffs also learned that Dr. Copenhaver had hospital privileges at both Borgess and Bronson. Based upon this information, plaintiffs sought unsuccessfully to have Judge Mullen recuse himself. Plaintiffs then sought de novo review of Judge Mullen's denial of the motion to disqualify. Chief Judge Lamb found that plaintiffs had presented him with no reason to justify the disqualification of Judge Mullen and denied plaintiffs' motion to disqualify.

A stipulation and order was subsequently entered applying the order compelling arbitration to defendants Copenhaver and Kalamazoo Radiology.

On appeal, plaintiffs assert that the March 29, 1985, arbitration agreement is invalid. Plaintiffs argue that the arbitration agreement was not executed in strict compliance with the Medical Malpractice Arbitration Act (MMAA), MCL 600.5040 *et seq.*; MSA 27A.5040 *et seq.*, that the agreement is an invalid unilateral contract, and that it is not binding because (1) Borgess' representative failed to sign Clarence's copy of the agreement, (2) plaintiffs never received a copy of the arbitration information booklet, (3) the agreement

was offered and signed prior to Clarence's receiving emergency medical care, and (4) the conduct giving rise to plaintiffs' allegations of malpractice occurred after discharge and outside the scope of the specific language of the arbitration agreement.

Pursuant to MCR 2.613(C), an appellate court will set aside the findings of fact of a trial judge sitting without a jury when such findings are clearly erroneous. A finding is clearly erroneous when, although there is evidence to support it, the reviewing court is left with a definite and firm conviction that a mistake has been made. *Tuttle v Dep't of State Highways,* 397 Mich 44, 46; 243 NW2d 244 (1976); *Rozier v Dep't of Public Health,* 161 Mich App 591, 600; 411 NW2d 786 (1987).

There is strong public policy in this state favoring arbitration: arbitration clauses should be liberally construed with all doubts about the arbitrability of an issue to be resolved in favor of arbitration. However, an arbitration agreement under the MMAA cannot be legally valid unless it is in strict compliance with the arbitration statute. *Ewald v Pontiac General Hospital,* 121 Mich App 793, 797; 329 NW2d 495 (1982); *Stefani v Bhagat,* 149 Mich App 431, 434; 386 NW2d 203 (1986), lv den 426 Mich 856 (1986).

In *McKinstry v Valley Obstetrics-Gynecology Clinic, PC,* 428 Mich 167, 173; 405 NW2d 88 (1987), our Supreme Court held that the party pleading the existence of a valid arbitration agreement bears the initial burden of going forward with the evidence establishing that the arbitration agreement was executed in strict compliance with the MMAA. This statutory presumption of validity accrues when the defendant offers evidence of the following:

(1) A written arbitration agreement complying

with the provisions of the MMAA has been signed by the person receiving health care or treatment or his legal representative;

(2) The arbitration agreement provides that the offer to arbitrate, if accepted by the patient, must be revocable in writing for sixty days;

(3) The arbitration agreement states, above the signature line in twelve-point boldface type: "THIS AGREEMENT TO ARBITRATE IS NOT A PREREQUISITE TO HEALTH CARE OR TREATMENT AND MAY BE REVOKED WITHIN 60 DAYS AFTER EXECUTION BY NOTIFICATION IN WRITING TO _____";

(4) The patient has been given a booklet detailing the specific provisions of the arbitration agreement;

(5) The patient has been given a copy of the arbitration agreement; and

(6) The offer to arbitrate did not precede the provision of emergency care. [*McKinstry, supra,* p 181.]

If a trial court determines that an arbitration agreement complies with the MMAA's provisions, factors (1)-(3), and that other independent evidence demonstrates compliance with factors (4)-(6), then the agreement to arbitrate must be presumed valid. Once the presumption of validity has been established, it will stand unless rebutted by evidence that either demonstrates noncompliance with the statutory requirements or establishes one or more defenses, such as coercion, mistake, duress or fraud. *McKinstry, supra,* p 181.

To sustain its ultimate burden of persuasion, a defendant may use evidence of habit or routine used by a hospital in admitting its patients. *McKinstry, supra,* pp 181-182.

We have reviewed Clarence's and Borgess' copies of the arbitration agreement in view of the statutory requirements and find that its content and form comply with the statute. Further, the testi-

mony of Debra Howe, the control clerk for Borgess' emergency department on the date of Clarence's treatment, concerning Borgess' custom and habit of providing each patient an information booklet and giving patients treated in the emergency room an arbitration agreement only after treatment had been rendered met *McKinstry* factors (4)-(6). *McKinstry, supra,* pp 181-182. On these facts, defendants have carried their burden, and the agreement is presumed valid.

The issue now becomes whether plaintiffs presented evidence that demonstrates noncompliance with *McKinstry* factors (4)-(6), and thereby rebutted the presumption of validity established by defendants.

Plaintiffs assert that Clarence was never provided with an arbitration information booklet as mandated by MCL 600.5042(7); MSA 27A.5042(7); MCL 600.5041(6); MSA 27A.5041(6). The trial court made no express finding on this issue, although finding that the MMAA had been complied with.

In this regard, Karen testified that neither she nor Clarence received a copy of the arbitration information booklet. On the other hand, Howe testified that in March, 1985, she customarily gave every patient, except those arriving by ambulance, a copy of the information booklet at the same time that she prepared the patient's chart and obtained the necessary treatment and insurance authorizations. Howe also testified that an emergency room nurse provided the arbitration agreement to each patient after treatment and that the patient then came to Howe's desk and signed the agreement. Howe added her signature, the date and the time of signing. The patient was given the yellow copy, but only after Howe signed the agreement.

However, plaintiffs severely damaged Howe's credibility by introducing the yellow patient copy

of the arbitration agreement Clarence received on March 29, 1985. The document does not bear Howe's signature, the date or time. However, Borgess' copy does. Despite her testimony, Howe obviously did not follow her usual custom and habit on the evening of March 29, 1985, and admitted as much to the trial court.

On these facts, a finding that Borgess provided Clarence with a booklet is clearly erroneous. Therefore, the trial court's finding that the statute had been complied with was in error and the order compelling arbitration is reversed.

Plaintiffs next argue that, although Clarence received emergency treatment, Borgess presented the arbitration agreement and Clarence signed it prior to receiving treatment, contrary to the MMAA.

MCL 600.5042(1); MSA 27A.5042(1), the "emergency exception," provides:

> A person who receives health care in a hospital may execute an agreement to arbitrate a dispute, controversy, or issue arising out of health care or treatment rendered by the hospital. A person receiving emergency health care or treatment may be offered the option to arbitrate but shall be offered the option after the emergency care or treatment is completed.

The trial court ruled that Clarence had been given the arbitration agreement after treatment based upon the following rationale:

> MCL 600.5042 states that "a person receiving emergency health care or treatment may be offered the option to arbitrate but shall be offered the option after the emergency or treatment is completed." . . . Therefore, the option was offered after the treatment was completed. The plaintiff

could have rejected arbitration for 60 days. The Court finds no problem with compliance with MCL 600.5042.

Application of this reasoning would result in deeming valid every arbitration agreement signed upon entry to a hospital and prior to the receipt of emergency medical treatment which is not revoked within the statutory period. This interpretation nullifies the effect of the express language of the statute.

The rules of statutory construction were concisely stated in *Nicholas v Michigan State Employees Retirement Bd,* 144 Mich App 70, 74; 372 NW2d 685 (1985):

> Briefly stated the rules are: (1) when a statute is unambiguous, further construction is to be avoided; (2) if an ambiguity exists, the intent of the Legislature must be given effect; (3) a construction which best accomplishes the statute's purpose is favored; (4) statutes are to be interpreted as a whole and construed so as to give effect to each provision; (5) specific words in a statute are given their ordinary meaning unless a different interpretation is indicated; and (6) respectful consideration is to be given to the construction of a statute used by those charged with its application.

Because the phrase "emergency health care or treatment" is ambiguous, the statute must be construed to give effect to the Legislature's intent. The question to be answered is whether emergency health care or treatment is to be defined so as to include the mere act of walking into an emergency room to seek health care or, rather, by the nature of the medical care or treatment necessary or believed necessary.

In *Pipper v DiMusto,* 88 Mich App 743, 745-746; 279 NW2d 542 (1979), a panel of this Court consid-

ered the nature of a patient's illness or injury in determining whether the emergency exception was applicable. Our Supreme Court engaged in such an analysis in *McKinstry, supra,* p 189.

The Legislature likely intended the emergency exception to prevent the endangering of life or health of a patient caused by the delay that would result if a seriously or critically ill or injured patient was required, prior to treatment, to read and consider the offered arbitration agreement. Therefore, we construe "emergency health care or treatment" to mean any care or treatment urgently warranted by circumstances under which such a delay would endanger the life or health of a patient.

Here, delaying Clarence's treatment for the length of time necessary for him to read a presented arbitration agreement and to decide whether to accept or reject it would not have endangered his life or health. Clarence did not receive emergency medical care treatment within the meaning of the MMAA and the emergency exception does not apply here. Therefore, it is irrelevant whether Clarence signed the agreement upon entry to the emergency room or upon discharge and plaintiffs' argument in this regard must fail.

Plaintiffs also claim that, because Borgess did not give Clarence a copy of the agreement bearing Borgess' agent's signature, Borgess did not communicate its acceptance of Clarence's offer to arbitrate and, therefore, no binding contract came into existence. The trial court disagreed, concluding that the pertinent parties had reached a meeting of the minds. We agree with the trial court.

Contract principles apply to arbitration agreements. *Horn v Cooke,* 118 Mich App 740, 744; 325 NW2d 558 (1982). A true meeting of the minds is

required for a valid arbitration agreement, just as in any contract. *Mariani v Holloway,* 157 Mich App 570, 574; 403 NW2d 463 (1986), lv den 428 Mich 870 (1987). A meeting of the minds is judged by an objective standard, looking to the express words of the parties and their visible acts. *Siegel v Spinney,* 141 Mich App 346, 350; 367 NW2d 860 (1985).

Here, Borgess presented Clarence with the arbitration agreement, which constituted an offer of the option to arbitrate. Clarence was free to accept or reject the offer. Karen read the agreement and explained its contents to Clarence, as did a member of the hospital staff. Clarence understood the agreement and signed it voluntarily. His signature constituted an acceptance of Borgess' offer. At that moment, there existed a meeting of the minds and a valid and enforceable contract. No error occurred.

Finally, plaintiffs argue that the alleged malpractice that serves as the gravamen of their complaint arose post-hospital discharge and, therefore, is not covered by the arbitration agreement. The trial court ruled otherwise on the ground that all of plaintiffs' claims of negligence arose from the mistreatment or misdiagnosis arising from the x-rays taken during Clarence's first visit.

The arbitration agreement Clarence signed reads:

> This agreement applies to my care during THIS hospital stay and/or emergency room visit and includes the hospital, its employees and its independent staff doctors and consultants who have also agreed to arbitrate.

The language of the agreement is clear and unambiguous.

When the language of a contract is clear and unambiguous, the intent of the parties will be ascertained according to its plain sense and meaning. *New Amsterdam Casualty Co v Sokolowski,* 374 Mich 340, 342; 132 NW2d 66 (1965); *Wilson v Home Owners Mutual Ins Co,* 148 Mich App 485, 490; 384 NW2d 807 (1986), lv den 425 Mich 876 (1986). Given its plain meaning and the fact that the word "THIS" is printed in capital letters and in bold-face type, we must conclude that the agreement was intended to include any malpractice committed while Clarence was on the hospital premises and receiving treatment. Medical action taken or not taken subsequent to Clarence's discharge is not covered by the agreement. X-rays were taken on March 29, 1985, during Clarence's emergency room visit, and most of plaintiffs' allegations of malpractice arise out of the subsequent readings of those x-rays on March 30, 1985, and actions taken or not taken thereafter.

While this Court notes that other language contained in Borgess' arbitration agreement booklet states that the arbitration agreement covers claims arising from care and treatment rendered, this language does not appear on the form Clarence signed. Borgess may not now assert that the booklet language is binding where that language was not included in the text of the agreement and where, in any event, Borgess has not shown that it gave a booklet to Clarence. Accordingly, we are left with a firm conviction that the trial court erred in ruling that the arbitration agreement was binding with regard to the defendants' actions taken subsequent to the treatment rendered Clarence on March 29, 1985.

Plaintiffs' second claim on appeal is that Judge Mullen should have been disqualified from presiding in this case pursuant to MCR 2.003(B)(1) and

(2). This Court disagrees. Where a party relies on alleged prejudice or bias of the trial judge in seeking his disqualification, the prejudice or bias must be shown. *MacDonald v Ford Motor Co,* 117 Mich App 538, 542; 324 NW2d 489 (1982), lv den 417 Mich 970 (1983).

Although Judge Mullen indicated that he had in fact sat on Bronson's Board of Directors for some time, it is clear that he is not a party interested in the instant litigation. Borgess is defending this suit, not Bronson, and Judge Mullen has no direct interest in the outcome of this suit against Borgess. Further, plaintiffs have shown no relationship between Borgess and Judge Mullen, and have presented no evidence that Judge Mullen harbored any bias or prejudice or that he let such prejudice override his responsibilities in providing a fair forum for the determination of the issues before him. Clearly, neither Judge Mullen nor Judge Lamb erred in denying plaintiffs' motion to disqualify.

The order denying disqualification of Judge Mullen is affirmed. That part of the order compelling arbitration is reversed, and this case remanded to the trial court for further proceedings consistent with this opinion.

Affirmed in part, reversed in part and remanded.